## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN JIANG,               ) | |
|                   ) | |
|        Plaintiff,    ) | Case No. _____ |
|                  ) | |
|    v.             ) | JURY TRIAL DEMANDED |
|                  ) | |
| ACACIA COMMUNICATIONS INC., ) | |
| VINCENT ROCHE, DAVID J. ALDRICH, ) | |
| PETER Y. CHUNG, LAURINDA Y. PANG, ) | |
| STAN J. REISS, JOHN RITCHIE, ) | |
| MURUGESAN SHANMUGARAJ, and ) | |
| BENNY P. MIKKELSEN,      ) | |
|                  ) | |
|       Defendants.   ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Acacia Communications, Inc. ("Acacia" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Acacia, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed merger of Acacia with Cisco Systems, Inc. ("Cisco Systems" or

"Parent") and Amarone Acquisition Corp. ("Merger Sub" and, together with Cisco Systems, "Cisco") (the "Proposed Transaction").

2.      On July 9, 2019, Acacia entered into an agreement and plan of merger (the "Merger Agreement"), whereby stockholders of Acacia common stock will receive the right to receive $70.00 for each share of Acacia common stock they own (the "Merger Consideration").

3.      On July 26, 2019, in order to convince Acacia's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections and related analyses completed by Acacia's financial advisor with respect to the Proposed Transaction, Goldman Sachs & Co. LLC ("Goldman Sachs"); (ii) the data and inputs underlying the financial valuation performed by Goldman Sachs; (iii) potential conflicts of interest on the part of Goldman Sachs; and, (iv) information underlying the negotiation of the Proposed Transaction and potential conflicts of interest on the part of the Individual Defendants.

5.      The special meeting of Acacia's stockholders to vote on the Proposed Transaction is imminent as Defendants have already taken its first step by filing the Proxy (the "Stockholder Vote").  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Stockholder Vote so Acacia's stockholders can properly exercise their corporate voting rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Acacia's public common stockholders sufficiently in advance of the upcoming stockholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## <u>JURISDICTION AND VENUE</u>

7.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Acacia's common stock trades on the Nasdaq Global Select Market ("Nasdaq"), a market that is headquartered in this District.  *See, e.g., United States v.*

*Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.     Plaintiff  John Jiang is, and has been continuously throughout all times relevant hereto, the owner of Acacia's common stock.

11.     Defendant Acacia is a Delaware corporation and maintains its principal executive offices at Three Mill and Main Place, Suite 400, Maynard, Massachusetts 01754.   Acacia "develops, manufactures and sells high-speed coherent optical interconnect products that are designed to transform communications networks through improvements in performance, capacity and cost." Proxy, 1.  The Company's common stock trades on the Nasdaq under the ticker symbol "ACIA." *Id.*

12.     Individual Defendant Vincent Roche ("Roche") is and has been Chair of the Acacia Board since 2017 and a member of the Board since 2016.

13.     Individual Defendant David J. Aldrich ("Aldrich") is and has been a member of the Acacia Board since 2017 and serves as a Member of the Audit Committee and the Compensation Committee.

14.     Individual Defendant Peter Y. Chung ("Chung") is and has been a member of the Acacia Board since 2013 and serves as Chairman of the Nominating and Corporate Governance Committee and as a Member of the Audit Committee.

15.     Individual Laurinda Y. Pang ("Pang") is and has been a member of the Acacia Board since June 2019 and serves as a Member of the Compensation Committee and the Nominating and Corporate Governance Committee.

16.     Individual Defendant Stan J. Reiss ("Reiss") is and has been a member of the Acacia Board since 2009 and serves as Chairman of the Compensation Committee.

17.     Individual Defendant John Ritchie ("Ritchie") is and has been a member of the Acacia Board since 2015 and serves as Chairman of the Audit Committee.

18.     Individual Defendant Murugesan Shanmugaraj ("Shanmugaraj") is and has been the President and Chief Executive Officer of Acacia since 2010 and serves as a member of the Acacia Board.

19.     Individual Defendant Benny P. Mikkelsen ("Mikkelsen") is one of the founders of Acacia and serves as a member of the Acacia Board.

20.     The defendants identified in Paragraphs 12 through 19 above are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

21.     According to its Website, Acacia "empower[s] cloud and service providers to meet the growing consumer demands for data."   "By implementing optical interconnect technology in a silicon-based platform, a process Acacia refers to as the 'siliconization of optical interconnect,' Acacia is able to offer products at higher speeds and density with lower power consumption, that meet the needs of cloud and service providers and can be easily integrated in a cost-effective manner with existing network."  Proxy, 31.

22.     Acacia was founded in 2009, and became a publicly traded company with its initial public offering in May 2016.

23.     Since going public in 2016, Acacia has grown by leaps and bounds.  Indeed, the Company marked its growth with an office expansion a year later, in May 2017, and Acacia's Chief Executive Officer and Founders were named EY Entrepreneur of the Year 2017 in New

England.  In fact, one of the standalone alternatives that the Company considered shortly before entering the Merger Agreement with Cisco was the acquisition of assets from a different company, Party D.

24.     Thus, the Proposed Transaction comes at a time when Acacia's recent and future success was not fully reflected by its share price.  The Proposed Transaction will "compensate" Acacia stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

25.     Despite Acacia's intrinsic value and growth prospects, the Individual Defendants are agreeing to sell the Company and depriving its stockholders of the ability to partake in the Company's future growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiffs and the Class to receive an inadequate Merger Consideration.

**The Background of the Proposed Transaction**

26.     On July 2, 2018, the Company received a non-binding expression of interest from Party C to acquire the Company "at a price of $41 per share."  Proxy, 34 The Proxy does not state whether Party C indicated whether its proposal entailed a cash-based transaction, an equity-based transaction, or a cash/equity mix.  The Board discussed the proposal during a telephonic special meeting on July 6, 2018 and instructed Shanmugaraj to reject it, which he did.  Proxy, 35

27.     On October 18, 2018, the Board held a regularly scheduled meeting at which senior management presented internal projections for the fiscal years ending December 31, 2019 through 2021 and engaged in a strategic discussion with the Board regarding "the Company's product roadmap and markets" (the Initial October 2018 Company Projections).  Proxy, 35.  The

Proxy does not state the substance of these "discussions" and does not provide the Initial October 2018 Company Projections.

28.     Cisco Systems accounted for 14% of the Company's reported revenues for the fiscal year ended December 31, 2018 and 18.1% of the Company's reported revenues for the fiscal quarter March 31, 2019.  Proxy, 35.  On February 23, 2019, David Goeckeler, Cisco Systems' Executive Vice President and General Manager of Cisco Systems' Networking and Security Business contacted Shanmugaraj by email requesting a phone call.  Proxy, 35.  During the next few weeks, Goeckeler and Shanmugaraj discussed the possibility of acquisition, and executed a confidentiality agreement and standstill provision on March 17, 2019.  Proxy, 35-36.

29.     During March 2019, the Company prepared an "update" to the internal projections (the "Long-Range Plan") which reflected "subsequent developments, including a new product development program that had been launched internally in late December 2018."  Proxy, 36.  The Proxy does not state how the "subsequent developments" actually altered the inputs and assumptions on which the Initial October 2018 Company Projections had relied.

30.     On April 1, 2019, Rob Salvagno, the Vice President of Corporate Development and Cisco Investments for Cisco Systems, called Shanmugaraj to communicate a proposal to acquire the Company for $62 per share.  Proxy, 36.  The Proxy does not state whether Cisco indicated whether its proposal entailed a cash-based transaction, an equity-based transaction, or a cash/equity mix.  On April 3, 2019, Shanmugaraj called Salvagno to inform him the proposal "did not reflect a sufficient premium to warrant further discussion with respect to a potential transaction."  *Id.*

31.     On April 10, 2019, Salvagno called Shanmugaraj to inform him that Cisco Systems was increasing its offer to $67 per share.  Proxy, 36.  The Proxy does not state whether

Cisco indicated whether its proposal entailed a cash-based transaction, an equity-based transaction, or a cash/equity mix.

32.     On April 15, 2019, Shanmugaraj met with a representative of Party C, whose senior management "wanted to gauge the Company's interest in exploring a strategic transaction." Proxy, 36. Shanmugaraj "expressed skepticism based on the prior acquisition proposal from Party C, but said he would keep an open mind[.]" *Id.*

33.     On April 17, 2019, the Board held a telephonic special meeting with senior management and its outside counsel, Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), to discuss Cisco's proposal. Proxy, 36. John Gavin, the Company's Chief Financial Officer, discussed issues attendant to Cisco's proposal, including the possibility that not merging with Cisco could reduce the Company's profitability if Cisco "shifted purchasing to a second source, sought to develop competitive technology internally or pursued an acquisition of a Company competitor in lieu of completing a transaction with the Company." *Id.* The Board "noted that Parent's proposal was not a significant premium over the current trading price of Company common stock, which had closed at $60.59 per share on April 16, 2019." Proxy, 37.

34.     During May 2019, there were several events that reflected "worsening trade relations between China and the United States," which included the failure to negotiate a U.S.-China trade deal and the resulting imposition of additional tariffs by the U.S. and China, "and the addition of Huawei Technologies Co., Ltd. and certain of its affiliates, referred to collectively as Huawei, to the 'Entity List' by the U.S. Department of Commerce." Proxy, 37. During May, the trading price of the Company's common stock fell from $60.45 per share on May 1, 2019 to $46.60 per share on May 31, 2019. The Proxy does not state whether Huawei and/or any of its affiliates were customers of the Company and, if so, the portion of the Company's revenue that

was related to products or services provided to Huawei and/or its affiliates.

35.     On May 23, 2019, Company management attended a telephonic meeting with representatives of Cisco, and Company management provided information requested by Cisco and further "expressed its willingness to bring Parent's $67 per share offer back before the board of directors for further discussion.  In response, Parent noted that they needed to reassess their valuation in light of recent events and the information presented by the Company."  Proxy, 38-39.

36.     On June 4, 2019, Shanmugaraj spoke to Salvagno, who communicated that Cisco was still interested but "in light of recent market developments, was now prepared to offer only $62 per share."  Proxy, 39.

37.     Later on June 4, 2019, Shanmugaraj had dinner with the Chief Executive Officer of Party C, "who reiterated that Party C was interested," and "would submit an offer," but still needed "additional financial and product information before Party C would be in the position to submit a proposal."  Proxy, 39.  On June 6, 2019, the Company and Party C executed an amendment to the confidentiality agreement entered on June 8, 2018, "which reinstated the standstill provision for an additional nine months," but provided that the standstill provision would terminate if a merger was announced.  *Id.*

38.     On June 6, 2019, Company management provided Party C with another set of revised Company projections (the "June Long-Range Plan" or "June LRP").  Proxy, 39.  The June LRP differed from the Long-Range Plan in that the Company's projections provided for an additional three years of projections (2019 through 2024), and were "based on a slower increase in the production rate for a new Company product due to the complexity of scaling initial production and the potential impact of trade and tariff discussions and actions by the U.S.

Department of Commerce against Huawei on overall optical market timing and spending expectations in China." *Id.* The Proxy does not state when the June LRP was first prepared.

39.     On June 8, 2019, The Board approved the June LRP for use by Goldman Sachs for its financial analyses. *Id.* Further, although the Proxy states that Goldman Sachs did not use the Initial October 2018 Company Projections or the Long-Range Plan in its financial analyses, the Proxy does not state whether the Board also approved Goldman Sachs to perform separate financial analyses based on the Initial October 2018 Company Projections and/or the Long-Range Plan, or instead instructed Goldman Sachs not to use the Initial October 2018 Company Projections or Long-Range Plan and instead base its financial analyses solely on the June LRP, only. The Proxy also does not state whether the approval of the June LRP was unanimous or not.

40.     Also at the June 8, 2019 telephonic special meeting, after approving the June LRP, the Board and Goldman Sachs discussed "a targeted approach to other potential strategic partners." Proxy, 39-40. Shanmugaraj "identified the five additional parties (beyond Parent, but including Party C) that he considered the most promising candidates from a strategic fit perspective." Proxy, 40. After identifying these potential counterparties, Shanmugaraj then eliminated all of them other than Cisco and Party C, and the Board instructed Shanmugaraj to respond to Cisco with "a counter-proposal of $72 per share in an all-cash transaction, and to advise Parent that the Company would be willing to proceed with formal due diligence at that price," and "to continue discussions with Party C to determine whether Party C could provide an attractive proposal." *Id.*

41.     On June 13, 2019, Cisco increased its offer to $64.50 per share. Proxy, 40. The Proxy does not state whether this proposal contemplated an all-cash proposal, an equity-based proposal, or a cash/stock mix. On June 17, 2019, the Board held a telephonic special meeting

with Goldman Sachs and WilmerHale, and discussed Cisco's proposal of $64.50 per share and the pending Party C proposal, and determined that "each of the remaining parties was significantly less likely to make a competitive proposal at that point in time due to one or more of a variety of factors, including: (i) lack of strategic fit, (ii) low probability of interest in light of strategic priorities, (iii) lack of familiarity with the Company's technology, (iv) lack of ability to finance a competitive, all-cash offer, (v) concerns over the prospects of parties that would need to offer stock consideration and (vi) the low probability of a timely offer or attractive valuation in light of such party's historical M&A activity." Proxy, 40-41. The Proxy does not state why the Company considered an all-cash offer superior to a stock-based transaction other than there being 'concerns over the prospects of parties that would need to offer stock consideration." The Board also asked whether the Company's senior management supported a transaction at $64.50 per share and whether Cisco "had communicated its plans for management," to which Shanmugaraj indicated that $64.50 was "an appropriate valuation" and "that no arrangements had been discussed, other than a general statement that management would likely have a certain degree of independence for a transitional period following the closing." *Id.* The Proxy does not state when Cisco made this "general statement" to Shanmugaraj. Ultimately, the Board determined to "propose to Parent that it increase its bid to $67 per share," and further "noted the importance of clarifying other key terms of Parent's proposal, including what commitments Parent was willing to make to obtain required regulatory approvals." Proxy, 41.

42.     Also on June 17, 2019, the Board established the Transaction Committee, consisting of Aldrich, Chung, Reiss, and John Ritchie. The Proxy does not state why the Board established the Transaction Committee so late in the negotiation process.

43.     On June 18, 2019, the Chief Executive Officer of Party C indicated that he

expected Party C's proposal to value the Company between $2.5 and $3.0 billion.  Proxy, 42.

Also on June 18, 2019, Salvagno informed Shanmugaraj that Cisco would increase its offer to

$65.50 per share in an all-cash transaction.  *Id.*  On June 19, 2019, the Transaction Committee

held a telephonic meeting with other members of the Board, the Company's senior management,

WilmerHale, and Goldman Sachs to discuss Cisco's proposal and the pending proposal from

Party C.  *Id.*  The Board determined to agree to engage in detailed due diligence and negotiations

at $65.50 per share and to "continue to support Party C's due diligence in the hope of eliciting a

more specific proposal."  *Id.*  When Shanmugaraj informed Salvagno that the Board would

engage in detailed due diligence and negotiations at $65.50 per share, he impressed "that the most

significant remaining concern of the board of directors was understanding the commitments that

Parent was willing to make to mitigate the potential risks to obtain required regulatory approvals

for the transaction."  *Id.*

44.    On June 21, 2019, a representative of Party C called a Goldman Sachs

representative to inform him that "Party C expected to deliver a written indication of interest in

acquiring the Company for $73 per share in cash, with no financing contingency."  Proxy, 43.

45.    On June 23, 2019, Salvagno called Shanmugaraj to request exclusivity.  Proxy,

43.  On June 24, 2019, Goldman Sachs informed Salvagno that the Company "had received an

inbound expression of interest from a third party" at a higher price and that the Company could

not agree to exclusivity.

46.    On July 3, 2019, Party C's Chief Executive Officer indicated that Party C was still

evaluating the transaction and "would need at least an additional two weeks to finalize its

evaluation of, and determine its willingness to proceed with, a transaction."  Proxy, 45.

Shanmugaraj informed him that "the other party was moving very quickly" so a definitive merger

agreement might be signed as early as July 8, 2019, and thus Party C was risking "loss of the transaction through the delay," to which Party C's Chief Executive Officer responded that "he understood the risk and was willing to take it." *Id.*

47.     On July 5, 2019, the Transaction Committee held a telephonic meeting and ultimately determined that "management and Goldman Sachs should indicate to Parent that the Company had a superior cash offer, but was willing to move forward quickly with Parent if it significantly increased its price to a number 'in the $70s' and agreed to a satisfactory resolution of regulatory matters, including a reverse termination fee for failure to close due to" regulatory issues.  Proxy, 46.  On July 6, 2019, Cisco increased its offer to $68.00 per share and, after Shanmugaraj responded that $68.00 was insufficient, again upped its offer to $70.00 per share, with an agreement to pay a reverse termination fee for failure to obtain regulatory approvals provided that the Company agreed to an equivalent amount for its termination fee.  *Id.*

48.     On July 8, 2019, Goldman Sachs spoke to Party C's Chief Financial Officer, who advised Goldman Sachs that Party C's timetable had not changed, so Party C still needed another week to complete its assessment of a potential transaction.  Proxy, 47.  Later on July 8, 2019, the Board held a telephonic meeting, at which it unanimously voted to approve the merger agreement and the transactions contemplated thereby, including the merger, to recommend the merger agreement to the Company's stockholders and to adopt a forum selection by-law amendment.  *Id.*

49.     On July 9, 2019, the Company and Cisco issued a joint press release, which stated, in part:

Cisco Intends to Acquire Acacia Communications

SAN JOSE, Calif. and MAYNARD, Mass., July 9, 2019 /PRNewswire/ --

- Acacia's coherent optics technology empowers webscale companies, service providers, and data center operators to meet the fast-growing

consumer demands for data

- Acacia is headquartered in Maynard, Massachusetts and is publicly traded on the NASDAQ

- Innovation across software, silicon and optics is fueling Cisco's initiative to make networks smarter, simpler and more secure

Cisco (NASDAQ: CSCO) and Acacia Communications (NASDAQ: ACIA) today announced they have entered into a definitive agreement under which Cisco has agreed to acquire Acacia. An existing Cisco supplier, Acacia designs and manufactures high-speed, optical interconnect technologies that allow webscale companies, service providers, and data center operators to meet the fast-growing consumer demands for data.

Under the terms of the agreement, Cisco has agreed to acquire Acacia for $70.00 per share in cash, or for approximately $2.6 billion on a fully diluted basis, net of cash and marketable securities. As Cisco and Acacia come together, Cisco plans to support Acacia's existing customers and new customers that want industry-leading coherent optics, digital signal processing / photonic integrated circuit modules, and transceivers for use in networking products and data centers.

"By innovating across software, silicon and optics, Cisco is reinventing every domain of the network with our intent-based architectures," said David Goeckeler, executive vice president and general manager of Cisco's networking and security business. "With the explosion of bandwidth in the multi-cloud era, optical interconnect technologies are becoming increasingly strategic. The acquisition of Acacia will allow us to build on the strength of our switching, routing and optical networking portfolio to address our customers' most demanding requirements."

Cisco offers a full portfolio of optical systems to support webscale, service provider, enterprise, and public sector customer segments. These optical systems address performance, power, and cost requirements. Acacia's technology will enrich Cisco's optical systems portfolio. It will also allow the growing number of customers transitioning from chassis-based systems to pluggable technology to simplify operations and reduce network complexities.

"Coherent technology has been a game-changer for optical networking and continues to evolve with the deployment of pluggable coherent optics," said Raj Shanmugaraj, president and chief executive officer, Acacia. "Upon close, Cisco and Acacia will continue to serve and support existing Acacia customers. By integrating Acacia technology into Cisco's networking portfolio, we believe we can accelerate the trend toward coherent technology and pluggable solutions while accommodating a larger footprint of customers worldwide."

The acquisition is expected to close during the second half of Cisco's FY2020, subject to customary closing conditions and required regulatory approvals. Upon completion of this transaction, Acacia employees will join Cisco's Optical Systems and Optics business within the networking and security business under David Goeckeler.

50.     Rather than continuing to build upon Acacia's improving prospects, the Merger Consideration being offered to the Company's public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Acacia common stock is materially in excess of the amount offered given the Company's recent financial performance and its prospects for future growth and earnings.

51.     Indeed, Party C had a pending non-binding proposal to acquire the Company for $73.00 per share, an amount that greatly exceeds the Merger Consideration contemplated in the Proposed Transaction.  In light of the plainly superior consideration that Party C had offered, the Company effectively sold out its public shareholders in agreeing to the preclusive deal-protection devices contained in the Merger Agreement rather than allowing Party C time to complete its due diligence and submit a final proposal.

**The Preclusive Deal Protection Devices**

52.     To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

53.     Section 5.3 of the Merger Agreement is a restrictive "no-shop" provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

54.     Section 5.3(a) of the Merger Agreement also strictly prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

55.     Section 5.3(b) of the Merger Agreement requires the Board to provide Cisco with written notice of any alternative Acquisition Proposal within twenty-four (24) hours of its receipt. Section 5.3(c) and (d) likewise require the Board to provide prior written notice of at least four (4) business days of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Cisco following Cisco's receipt of the notice, so that Cisco has the opportunity to adjust the terms and conditions of the Merger Agreement so that the alternative Acquisition Proposal ceases to be a Superior Proposal.

56.     In addition, the Merger Agreement provides that the Company will be required to pay to Cisco a termination fee of $120,000,000.00 with respect to any termination under the No-Shop provisions of the Merger Agreement or because the Company's stockholders do not vote in favor of adopting the Merger Agreement.

57.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company, and further restrain the Company's public stockholders' ability to disapprove the Proposed Transaction.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

58.     Indeed, the imposition of a $120,000,000 termination fee in the event that the Company's stockholders do not vote in favor of adopting the Merger Agreement all but requires

the Company's shareholders to vote in favor of the Proposed Transaction by holding a substantial portion of the Company's equity hostage.

59.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

60.     On July 26, 2019, Defendants filed a materially incomplete and misleading Preliminary Proxy Statement with the SEC.  The special meeting of Acacia stockholders to vote on the Proposed Transaction is forthcoming.   The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting decision in connection with the Proposed Transaction.  Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction and the Individual Defendants' potential conflicts of interest; and (ii) information regarding the assumptions and inputs that render Goldman Sachs' fairness analysis materially false, misleading, or incomplete.

**A.  The Proxy Omits Material Information Regarding the Background of the Proposed Transaction and the Individual Defendants' Potential Conflicts of Interest**

61.     The Proxy fails to provide material information regarding the background of the merger that implicate potential conflicts of interest for Acacia's directors.

62.     The Proxy states that senior management presented and discussed the Initial October 2018 Company Projections on October 18, 2018.  The Proxy fails to disclose the substance of these "discussions" and does not provide the Initial October 2018 Company

Projections.  This information is material to stockholders considering how to vote on the Proposed Transaction because it is possible that stockholders would find the assumptions and inputs on which the Initial October 2018 Company Projections were based would more accurately reflect the Company's long-term growth prospects than the assumptions and inputs on which the Long-Range Plan and June LRP were based.

63.     The Proxy states that the Company prepared the Long-Range Plan in March 2019 as an update to the Initial October 2018 Company Projections based on "subsequent developments, including a new product development program that had been launched internally in late December 2018."  The Proxy fails to fully disclose how these "subsequent developments" actually altered the inputs and assumptions on which the Initial October 2018 Company Projections relied, and further fails to disclose whether, in retrospect, the Long-Range Plan actually more accurately reflected the Company's growth prospects relative to the Initial October 2018 Company Projections based on the information currently available to Defendants, including the Company's financial results during the year to date.  This information is material to shareholders considering whether to vote in favor of the Proposed Transaction because the Initial October 2018 Company Projections may more accurately reflect the Company's long-term growth prospects than the Long-Range Plan and June LRP projections that are actually in the Proxy.

64.     The Proxy states that Salvagno called Shanmugaraj to communicate a proposal to acquire the Company for $62 per share on April 1, 2019 and called again to increase the offer to $67 per share on April 10, 2019.  The Proxy does not disclose whether these proposals entailed a cash-based transaction, an equity-based transaction, or a cash/equity mix.  This information is material to shareholders deciding how to vote on the Proposed Transaction because the Company

expressly considered the risks attendant to stock-based consideration in proposals from other potential counterparties. In light of the Company's treatment of stock-based or cash-stock mix-based proposals from potential counterparties other than Cisco, any public shareholder would be left wondering whether the Defendants, in fact, actually sought to maximize potential shareholder value or instead dismissed the possibility of stock-based merger consideration to resolve liquidity issues for the Company's insiders. Indeed, the Proxy discloses that fourteen (14) of the Company's directors and officers stand to receive more than $225 million in common stock, more than $30 million in vested equity awards, and more than $15 million in unvested restricted stock units, and this equity simply cannot be readily exchanged for cash on the open market without affecting the Company's trading price. Proxy, 66. Further, although the Proxy provides some details about when Restricted Stock Units ("RSU's") awarded on April 28, 2016 would become vested absent acceleration through change of control of the Company, the Proxy contains no details as to when many of the other RSU's would become vested.

65. The Proxy states that were several events reflected "worsening trade relations between China and the United States" during May 2019, including the failure to negotiate a U.S.-China trade deal and the resulting imposition of additional tariffs by the U.S. and China, "and the addition of Huawei Technologies Co., Ltd. and certain of its affiliates, referred to collectively as Huawei, to the 'Entity List' by the U.S. Department of Commerce," and further states that, the trading price of the Company's common stock fell from $60.45 per share on May 1, 2019 to $46.60 per share on May 31, 2019. The Proxy fails to disclose whether Huawei and/or any of its affiliates were customers of the Company and, if so, the portion of the Company's revenue that was related to products or services provided to Huawei and/or its affiliates. This information is material to shareholders considering how to vote on the Proposed Transaction because the

Proxy implicitly links the trading price of the Company's common stock to the addition of Huawei to the "Entity List" and the United States' trade relations with China could improve or worsen irrespective of Huawei remaining on or being removed from the "Entity List." Thus, whether Huawei is a customer and, if so, the portion of the Company's revenue that is related or tied to business in connection with Huawei and/or its affiliates is inherently tied to the intrinsic value of the Company's common stock. This information is further material to shareholders considering how to vote on the Proposed Transaction because the Company considered the United States' actions vis-à-vis Huawei in preparing the June LRP.

66.     The Proxy states that Company management provided Party C with the June LRP on June 6, 2019 and further states that the Board approved the June LRP for use by Goldman Sachs for its financial analyses. *Id.* The Proxy does not state when management prepared the June LRP projections and, although the Proxy states that Goldman Sachs did not use the Long-Range Plan in its financial analyses, the Proxy does not state whether the Board also approved Goldman Sachs to perform a separate set of financial analyses based on the Initial October 2018 Company Projections, the Revised October 2018 Company Projections (i.e., the Long-Range Plan), or instead instructed Goldman Sachs not to use the October 2018 Company Projections and instead base its financial analyses on the June LRP, only. The Proxy also does not state whether the approval of the June LRP was unanimous or not. As the Proxy provides no basis or explanation for why former Board member Eric A. Swanson abruptly resigned during the negotiations on June 1, 2019, *i.e.,* just days before the Board approved the June LRP and a month before the Proposed Transaction was announced, there is no question that shareholders would find the date the June LRP was first prepared and whether the June LRP was unanimously approved by the Board to be material information because the assumptions and inputs on which

the Initial October 2018 Company Projections or the Long-Range Plan were based could more accurately reflect the Company's long-term growth prospects than the assumptions and inputs on which June LRP were based.

67.     The Proxy states that Cisco increased its offer to $64.50 per share on June 13, 2019 but fails to disclose whether this proposal contemplated an all-cash proposal, an equity-based proposal, or a cash/stock mix.  This information is material to stockholders deciding how to vote on the Proposed Transaction because the Company expressly considered the risks inherent in stock-based transactions in considering the viability of other potential counterparties' proposals.

68.     The Proxy states that the Board discussed Cisco's proposal of $64.50 per share and the pending Party C proposal on June 17, 2019, and further determined that "each of the remaining parties was significantly less likely to make a competitive proposal at that point in time due to one or more of a variety of factors, including: (i) lack of strategic fit, (ii) low probability of interest in light of strategic priorities, (iii) lack of familiarity with the Company's technology, (iv) lack of ability to finance a competitive, all-cash offer, (v) concerns over the prospects of parties that would need to offer stock consideration and (vi) the low probability of a timely offer or attractive valuation in light of such party's historical M&A activity."  The Proxy fails to disclose why the Company considered an all-cash offer superior to a stock-based transaction other than there being 'concerns over the prospects of parties that would need to offer stock consideration."  This information is material to shareholders deciding how to vote on the Proposed Transaction because shareholders would wonder whether the Board did not maximize public shareholder value by not fairly valuing or considering stock-based proposals.  Again, the Proxy's failure to disclose this information leaves Acacia's public shareholders to wonder

whether the Individual Defendants undervalued the Company in approving Merger Consideration at a price that does not adequately reflect the Company's true value in order to accelerate the vesting of their RSUs and obtain cash in exchange for large stock holdings that would otherwise be illiquid.

69.     The Proxy also states that, on June 17, 2019, Shanmugaraj indicated that no arrangements had been discussed regarding continuing operations following a cash merger with Cisco, "other than a general statement that management would likely have a certain degree of independence for a transitional period following the closing."  The Proxy does not state when Cisco made this "general statement" to Shanmugaraj.  This information is material to shareholders considering whether to vote in favor of the Proposed Transaction because such "general statements" at the beginning of negotiations may have caused Shanmugaraj to steer negotiations towards Cisco and away from other potential counterparties that might offer superior merger consideration to public shareholders but not allow for such "independence."

70.     The Proxy also states that the Board initially considered forming the Transaction Committee on June 8, 2019, and established the Transaction Committee, consisting of Aldrich, Chung, Reiss, and John Ritchie on June 17, 2019.  The Proxy does not state why the Board established the Transaction Committee so late in the negotiation process.  This information is material to shareholders deciding how to vote on the Proposed Transaction because it suggests that the Transaction Committee may have been formed to avoid conflicts of interest, that may have caused one or more of the persons directing negotiations to steer negotiations towards Cisco and away from other potential counterparties.

71.     The Proxy states that the Company and Cisco negotiated the terms of a draft merger agreement between June 21, 2019 and July 8, 2019, including provisions relating to: (i)

allocation of risks associated with regulatory approvals, (ii) restrictions on the Company's operations between signing and closing, (iii) the ability of the Board to respond to unsolicited acquisition proposals, change its recommendation and accept a superior proposal, (iv) the amount and triggers for the Company's termination fee, (v) the closing conditions, (vi) the definition of a material adverse effect, and (vii) the scope of the representations and warranties.  The Proxy further states that the Company conditioned the merger on Cisco agreeing to pay a reverse termination fee for failure to obtain regulatory approvals, and further states that Cisco agreed to such a reverse termination fee only on the condition that the Company agreed to an equivalent amount for its termination fee.  The Proxy fails to disclose whether the Company attempted to negotiate a "Keep-Shop" period during which the Board could have accepted a Superior Proposal from Party C without triggering the $120,000,000 termination fee.  The Proxy also fails to disclose how the Board determined that the same termination fee should apply to a termination by the Company in the event that the Board honored its fiduciary duties to its shareholders in the event that it was forced to ultimately accept an unsolicited Superior Proposal as should apply to a termination for the failure to obtain regulatory approval, a contingency over which neither the Company nor Cisco had any control.

**B. The Proxy Omits Material Information Regarding Financial Projections, Inputs, and Assumptions for Various Financial Valuations and the Company's Financial Advisors' Potential Conflicts of Interest**

72.      The Proxy describes Goldman Sachs' Fairness Opinion and the various valuation analyses that Goldman Sachs performed to render its opinion.  However, the Proxy fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness analysis.  Specifically, the Proxy does not disclose enough information regarding the financial projections,

inputs and assumptions for various financial valuations, and Goldman Sachs' potential conflicts of interest.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate Goldman Sachs' opinion that the consideration offered to the Company's shareholders in the Proposed Transaction is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  These key inputs, which were baked into those conclusions, must also be fairly disclosed.

73.    The Proxy fails to provide all of the financial projections provided by management.  Indeed, the Proxy fails to provide any of the Initial October 2018 Company Projections at all, and does not fully explain how the inputs and assumptions underlying the Long-Range Plan and the June LRP differed from the inputs and assumptions underlying the Initial October 2018 Company Projections.

74.    Further, the Proxy fails to provide all of the financial projections provided by management with regard to the Long-Range Plan and the June LRP.  With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

75.    With respect to the Long-Range Plan, the Proxy fails to provide financial projections for fiscal years ending 2019 through 2021, for the following items: (i) Taxes (or tax rate), (ii) Stock-based compensation expense, (iii) Changes in net working capital, (iv) Capital expenditures, (v) Adjusted Depreciation & Amortization, (vi) Any other line items used in the calculation of unlevered free cash flow, and (vii) Unlevered free cash flow as projected under the

assumptions underlying the Long-Range Plan.

76.     With respect to the June LRP, the Proxy fails to provide financial projections for fiscal years ending 2019 through 2024, for the following items: (i) Taxes (or tax rate), (ii) Stock-based compensation expense, (iii) Changes in net working capital, (iv) Capital expenditures, (v) Adjusted Depreciation & Amortization, and (vi) Any other line items used in the calculation of unlevered free cash flow.

77.     With respect to Goldman Sachs' *Historical Stock Trading Analysis* beginning on Page 53, the Proxy states that "Goldman Sachs reviewed the historical trading prices and volumes for the Company common stock for the 52-week period ended July 5, 2019," and "analyzed the $70.00 in cash per share of the Company's common stock," compared to "(i) the highest closing price per share of Company common stock for the 52-week period ended July 5, 2019; and (ii) the lowest closing price per share of Company common stock for the 52-week period ended July 5, 2019." The Proxy fails to disclose the dates on which the Company's stock traded at its highest and lowest prices during this 52-week period, and further fails to otherwise disclose the variance in trading price or summarize the closing prices by any central tendency metrics.   Without this information, it is impossible to tell whether the range fairly summarizes the data observed.  This omitted information is material to a shareholder deciding whether to tender stock because it goes directly to how much weight the investor should place on the *Historical Stock Trading Analysis*.

78.     With respect to Goldman Sachs' *Selected Companies Analysis* beginning on Page 54, the Proxy fails to disclose the basis for inclusion of the selected companies other than a vague statement that they are "publicly traded corporations in the optical and semiconductor industries" and a question-begging statement that "they were chosen because they are publicly traded companies with operations that for purposes of analysis may be considered similar to certain

operations of the Company.  The Proxy further fails to disclose the basis for Goldman Sachs'
selected range of multiples for the selected companies, why Goldman Sachs selected these ranges,
the range of individual multiples for each selected company, and the individual multiples for each
selected company.  The Proxy further appears to mislabel one of the tables because both tables
are called "Average NTM EV/EBITDA Multiples," so it is impossible to determine whether the
table at the top of Page 55 actually entails the Earnings Per Share multiples.  This information is
important for shareholders considering the *Selected Companies Analysis* because any conclusions
that can be drawn from this analysis turn on the multiples of the companies that were selected,
and without knowing whether any outliers were erroneously included, it is impossible to
determine how much weight can be placed in its conclusions.  Further, the conclusions of the
*Selected Companies Analysis* are particularly sensitive to the inclusion of outlier companies
because the data are summarized only by "average" (presumably, the mean), which implicates
the possibility that outliers may greatly skew the results.

79.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price
Analysis* beginning on Page 55, the Proxy fails to disclose the inputs used for deriving Goldman
Sachs' selected discount rate of 9.5%.  This information is material because the results of the
*Illustrative Present Value of Future Share Price Analysis* are inherently vulnerable to artificial
inflation or deflation of the discount rate input.  Indeed, a banker can make any transaction seem
"fair" by selecting a discount rate *post hoc* that effectively discounts the future value per share to
the present value of the Merger Consideration.  Moreover, the Proxy also fails to disclose
Goldman Sachs' basis for selecting a range of NTM EV/EBITDA multiples ranging from 14.0x
to 18.0x and a range of NTM P/E multiples ranging from 20.0x to 25.0x when these ranges depart
significantly from the average multiples for the Company as Goldman Sachs calculated in the

*Selected Companies Analysis*.  Again, a banker can make any transaction seem "fair" by selecting

a range of multiples *post hoc* that effectively suppresses the future value per share so that its

discounted value will be consistent with the Merger Consideration.  Thus, without knowing the

basis for the selected range of multiples and the selected discount rate, it is impossible to know

how much weight, if any, to place on the *Illustrative Present Value of Future Share Price*

*Analysis*.

80.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*

beginning on Page 56, the Proxy fails to disclose: (i) the inputs used for deriving Goldman Sachs'

selected discount rate range of 9.0% to 10.0%, (ii) the value of the Company's NOLs accounted

for in this analysis, if at all; (iii) a full sensitivity table; (iv) the entire range of discount rates,

growth rates, and projected unlevered, after-tax free cash flows; (v) the actual number of fully

diluted shares of the Company; and (vi) why it selected the "illustrative enterprise values for the

Company by adding the ranges of present values it derived above" rather than basing them on the

Company's multiples as calculated in its *Selected Companies Analysis*, and (vii) the basis for

selecting a range of perpetuity growth rates from 2.75% to 3.75%.  The Proxy further fails to

disclose whether and, if so, how the results of the *Illustrative Discounted Cash Flow Analysis*

would have been different under the inputs and assumptions underlying the Initial October 2018

Company Projections or the Long-Range Plan rather than the inputs and assumptions underlying

the June LRP.  This information is material to stockholders because it pertains directly to the

intrinsic value of the Company's common stock.  Again, a banker can make any transaction seem

"fair" simply by changing the inputs and assumptions to project and discount future cash flows

to the present value of the Merger Consideration.

81.     With respect to Goldman Sachs' *Selected Transactions Analysis* beginning on

Page 56, the Proxy does not state the reasons Goldman Sachs selected a cutoff date for inclusion of September 2011, and further does not explain the criteria used for selection other than the question-begging statement that the selected transactions included "companies with operations that, for the purpose of analysis, may be considered similar to certain of the Company's results, market size and product profile."   The Proxy also fails to disclose the included transactions' individual companies' results, market size, and product profile (other than generally separating them as "Optical" or "High Growth Semiconductor").   The Proxy also fails to disclose the NTM EBITDA multiple in Opnext, Inc's acquisition by Oclaro, Inc., and further fails to disclose why the NTM EBITDA rendered the transaction "not meaningful" in Goldman Sachs' view.   The Proxy also fails to disclose why Goldman Sachs based its applied reference range of multiples on the approximate medians of the selected transactions involving optical companies and the approximate median of the reference range of multiples of the selected transactions involving high growth semiconductor companies as opposed to the actual range of multiples of the selected transactions.   The Proxy Statement also fails to disclose the P/E multiples of the selected companies.  This information is important for shareholders considering the *Selected Transactions Analysis* because its conclusions turn on the transactions that were selected, and without knowing all of the independent criteria used in determining whether a company was "considered similar," it is impossible to determine whether any outliers were erroneously included.   Further, the conclusions of the *Selected Transactions Analysis* are particularly vulnerable to the inclusion of outlier transactions or failure to include relevant transactions because of the high degree of variance in multiples for the transactions in the High Growth Semiconductor transactions, and the possibility that the company multiples in Opnext, Inc's acquisition by Ocalro, Inc. was "not meaningful" because it would have resulted in a significantly higher valuation of the Company.

82.     With respect to Goldman Sachs' *Premia Analysis* beginning on Page 57, the Proxy states that Goldman Sachs "reviewed and analyzed, using publicly available information, the acquisition premia for all-cash acquisition transactions announced during the five-year period preceding July 5, 2019 involving a public company in the technology sector based in the United States as the target where the disclosed enterprise values for the transaction were greater than $1 billion, which transactions were identified by Thomson SDC," and "calculated the median, 25th percentile and 75th percentile premia of the prices paid in the transactions relative to the target companies'," trading prices on the "last undisturbed closing share price prior to the announcement of the transaction" and the "highest closing stock prices in the 52 weeks ended July 5, 2019."[1]  The Proxy fails to disclose why Goldman Sachs limited its analysis to all-cash transactions, and whether it was instructed to do so by the Company.  This information is material to shareholders deciding whether to vote on the Proposed Transaction because the Company had received alternative proposals that contemplated a stock-based transaction that may have contemplated a greater premium to public shareholders at the cost of not cashing out the Company's insiders.

83.     Also with respect to the *Premia Analysis*, the Proxy fails to disclose whether Goldman Sachs considered a press release that a company was anticipating a merger as "disturbing" the share price or whether the "last undisturbed share price prior to the announcement of the transaction" was based on the closing price on the date prior to the announcement of the transaction itself.  This information is material to shareholders deciding how to vote on the Proposed Transaction because the announcement that a company is anticipating a merger often causes the value of its stock to "jump" in anticipation of the premium that will be paid to compensate shareholders for intrinsic value that was not reflected in the trading price prior to the announcement that the company was anticipating a merger.  *See, e.g., In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483 (S.D.N.Y. 1994) ("The fact that Columbia stock jumped 25 percent when Columbia finally announced in September 1989 that it was engaged in acquisition

---

[1] Although the Proxy states that the premium was calculated relative to the companies' "highest closing stock prices in the 52 weeks ended July 5, 2019," it seems likely that the Proxy meant to state that the premium was calculated relative to the companies' "highest closing stock prices in the 52 weeks *prior to the announcement of the transaction*."

discussions with an unannounced suitor is convincing evidence that whatever 'acquisition expectations' were previously built into Columbia stock before this date were less than fully confident ones.").

84.     Also with respect to the *Premia Analysis*, the Proxy fails to disclose the total number of transactions reviewed, the individual premium in each transaction, and whether and, if so, how the premia paid in these transactions varied by industry within the technology sector.  This information is material to shareholders because the premium paid across industries within the technology sector may be highly variable; indeed, the *Selected Companies Analysis* and *Selected Transactions Analysis* expressly separate companies in the Optical Industry from companies in the Semiconductor Industry and provide convincing evidence that there are significant differences in the companies' financial multiples across these two industries.  Moreover, the failure to disclose the individual transactions analyzed renders the *Premia Analysis* misleading because it prevents shareholders from identifying the premium that should be paid in a transaction where the acquiror is one of the target company's largest customers, as Cisco is vis-à-vis Acacia.  Further, without knowing the total number of transactions reviewed and the individual premium paid in each transaction, it is impossible to determine how reliable the results of the *Premia Analysis* are, and where the premium that should have been paid in the Proposed Transaction actually falls within the range of results in the *Premia Analysis*.

85.     If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).  Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.

Thus, Defendants' omission renders the projections disclosed in the Proxy misleading.

86.     The Proxy also fails to fully disclose all potential conflicts-of-interest for Goldman Sachs.  This conflict of interest information is material to shareholders because it directly informs shareholders as to how much weight they should give to Goldman Sachs' Fairness Opinion.

87.     Pages 58-59 of the Proxy disclose that Goldman Sachs' fee is "estimated, based on the information available as of the date of announcement, to be approximately $33.6 million from the Company" but fails to disclose why the fee is "estimated" rather than precise.

88.     Page 59 of the Proxy states that Goldman Sachs' was engaged "pursuant to a letter agreement dated June 25, 2019," but it is clear from the Background of the Merger section of the Proxy that Goldman Sachs had long been acting as the Company's financial advisor in connection with the Proposed Transaction much earlier than June 25, 2019.  The Proxy fails to disclose the details of Goldman Sachs' previous arrangement with the Company, whether the Company and Goldman Sachs adopted a new fee arrangement on June 25, 2019, and, if so, why the Company and Goldman Sachs adopted this new arrangement.

89.     Further, Page 59 of the Proxy also states that Goldman Sachs "may also in the future provide investment banking services to the Company, Parent and their respective affiliates for which the Investment Banking Division of Goldman Sachs may receive compensation," but fails to disclose whether any services are, in fact, mutually understood to be contemplated at this time between Goldman Sachs, Acacia, and/or Cisco.

90.     Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

91.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure

of the foregoing material information prior to the upcoming stockholder vote concerning the Proposed Transaction, Plaintiff and the Company's other public shareholders will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I
### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)

92.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

93.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

94.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

95.     The omission of information from a Proxy will violate Section 14(a) and Rule

14a-9 if other SEC regulations specifically require disclosure of the omitted information.

96.     Defendants have issued the Proxy with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) complete and accurate financial projections for the Company; (ii) complete and accurate valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion; and (iii) potential conflicts of interest on the part of the Individual Defendants and the Company's Financial Advisors with respect to the Proposed Transaction.

97.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

98.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered

the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

99.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a Proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

100.    The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

101.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who

will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Stockholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

102.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

103.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

104.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

105.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

106.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

107.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

108.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

109.   Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.   Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Stockholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted

from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 2, 2019                              **MONTEVERDE & ASSOCIATES PC**

By:   _/s/ Juan E. Monteverde_
     Juan E. Monteverde (JM-8169)
     The Empire State Building
     350 Fifth Avenue, Suite 4405
     New York, NY 10118
     Tel:(212) 971-1341
     Fax:(212) 202-7880
     Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
     jfruchter@ademilaw.com

*Attorneys for Plaintiff*